UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re AbbVie Inc. Product Liability Litigation | ) | Case No. 1:14-cv-1748 |
| Coordinated Pretrial Proceedings | ) | Honorable Matthew F. Kennelly |
| | ) | |
| | ) | |
| | ) | |
| Mickey G. Schwalm, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.   1:14-cv-2899 |
| AbbVie Inc., | ) | |
| Abbott Laboratories, Inc., | ) | |
| Actavis plc, | ) | |
| Actavis, Inc., | ) | |
| Actavis Pharma, Inc., | ) | |
| Anda, Inc., and, | ) | |
| Watson Laboratories, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, Mickey G. Schwalm ("Plaintiff"), residing in Fort Myers, Florida, by and through his undersigned counsel, hereby sues Defendants AbbVie Inc., Abbott Laboratories, Inc., Actavis plc, Actavis, Inc., Actavis Pharma, Inc., Anda, Inc., and Watson Laboratories, Inc. ("Defendants") and alleges as follows:

## INTRODUCTION

1.     This case involves the prescription drugs AndroGel and Androderm ("Testosterone"), which are manufactured, sold, distributed and promoted by Defendants as Testosterone Replacement Therapies.

2.      Defendants misrepresented that Testosterone is a safe and effective treatment for hypogonadism or "low testosterone," when in fact these drugs cause serious medical problems, including life threatening cardiac events, strokes, and thrombolytic events.

3.      Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for Testosterone.  Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "Low T."

4.      As a result, diagnoses of Low T have increased exponentially.  This has directly related to Testosterone sales increasing to over a billion dollars per year.

5.      However, consumers of Testosterone were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

## PARTIES

6.      Plaintiff is a natural person and a citizen of Lee County, State of Florida.

7.      Defendant Abbott Laboratories, Inc. is a corporation organized and existing under the laws of Illinois and maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.

8.      Defendant AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

9.      By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought FDA approval in 1999.  Before the drug was approved by the FDA in 2000, Solvay Pharmaceuticals Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently

brought AndroGel to market. In 2010, Defendant Abbott Laboratories, Inc. acquired Solvay's pharmaceutical division, which included AndroGel. Then, in 2013, Abbott created AbbVie, a company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel.

10. Defendant Actavis plc is a corporation organized and existing under the laws of Ireland and has a principal place of business at 1 Grand Canal Square, Docklands, Dublin 2, Ireland.

11. Defendant Actavis, Inc. (formerly known as Watson Pharmaceuticals, Inc.) is a corporation organized and existing under the laws of the State of Nevada and has a principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

12. Defendant Actavis Pharma, Inc. (formerly known as Watson Pharma, Inc.) is a corporation organized and existing under the laws of the State of Delaware and has a principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

13. Defendant Anda, Inc. is a corporation organized and existing under the laws of the State of Florida and has a principal place of business at 2915 Weston Road, Weston, Florida 33331.

14. Defendant Watson Laboratories, Inc. is a corporation organized and existing under the laws of the State of Nevada and has a principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

15. By way of background, Watson Pharmaceuticals, Inc. acquired Actavis Group in November 2012 and adopted Actavis' name for its global operations. Watson Laboratories, Inc.,

Actavis Pharma, Inc., and Anda, Inc. are wholly-owned subsidiaries of Actavis, Inc. Actavis, Inc. is a wholly-owned subsidiary of Actavis plc.

16.     At all times herein mentioned, Defendants, in interstate commerce and in this judicial district, advertised, promoted, supplied, and sold to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public certain pharmaceutical products, AndroGel and Androderm.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

18.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and because a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## GENERAL ALLEGATIONS

19.     This action is for damages brought on behalf of Plaintiff who was prescribed and supplied with, received and who has taken and applied the prescription drugs AndroGel and Androderm as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.  This action seeks, among other relief, general and

special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by these drugs.

20.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

21.     At all times herein mentioned, the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drugs AndroGel and Androderm for the use and application by Plaintiff.

22.     At all times herein mentioned, Defendants were authorized to do business within the state of residence of Plaintiff.

23.     At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

24.     Plaintiff files this lawsuit within the applicable limitations period of first suspecting that said drugs caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful case of Plaintiff's injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when Plaintiff's injuries were discovered their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable

limitations period prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public and to the medical profession that their Testosterone drugs are safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

## OVERVIEW

25.     Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

26.     In 1999, when Unimed Pharmaceuticals Inc., one of the Defendants' predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."

27.     In 2000, when the FDA approved AndroGel, the company announced that the market was "four to five million American men." By 2003, the number increased to "up to 20 million men."  However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get Testosterone prescriptions have no evidence of hypogonadism.  For example, one third of men prescribed Testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a Testosterone prescription.

28.     Defendants coordinated massive advertising campaigns designed to convince men that they suffered from low testosterone. Defendants orchestrated national disease awareness media blitzes that purported to educate male consumers about the signs of low testosterone. The marketing campaigns consisted of television advertisements, promotional

literature placed in healthcare providers' offices and distributed to potential Testosterone users, and online media.

29. The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss Testosterone Replacement Therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness— all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

30. Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

31. While running disease awareness campaigns, Defendants promote their Testosterone products as easy to use topical Testosterone Replacement Therapies. Defendants contrast their products' at-home topical application with less convenient prescription Testosterone injections, which require frequent doctor visits.

32. Defendants convinced millions of men to discuss Testosterone Replacement Therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription Testosterone Replacement Therapy had been available for years, millions of men who had never been prescribed Testosterone flocked to their doctors and pharmacies.

33. What consumers received, however, were not safe drugs, but products which cause life-threatening problems, including strokes and heart attacks.

34.     Defendants successfully created a robust and previously nonexistent market for their drugs.  Defendants spent millions of dollars promoting Testosterone and millions more on unbranded marketing including commercials and websites, www.IsItLowT.com and www.DriveForFive.com, sites which recommend that men have regular checkups with their physicians and five regular tests done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

35.     Defendants' advertising paid off in a return of $1.4 billion in AndroGel sales and $87 million in Androderm sales during the past year. This makes AndroGel the biggest selling androgen drug in the United States.  Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts.  Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?*, May 10, 2012, Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

36.     In early 2013, Medical Marketing & Media named two AbbVie executives as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance low T. *See* Singer, *Selling That New-Man Feeling*, *supra*; See *also*, Larry Dobrow, *All-star large pharma marketing team of the year: Androgel*.  Jan. 2, 2013, Medical Marketing & Media, *available at:* http://www.mmm-online.com/all-star-large-pharma-marketing-team-of-the-year-androgel/article/273242/.

37.     The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of Testosterone is safe for human use, even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

38.     There have been a number of studies suggesting that Testosterone in men increases the risk of heart attacks and strokes.

39.     In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the Testosterone group were suffered adverse events.

40.     In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" which indicated that Testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

41.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that Testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

42.     The Food and Drug Administration approved Androderm on September 29, 1995 for the treatment of adult males who have low or no testosterone. The FDA approved AndroGel 1% on February 28, 2000 (AndroGel 1.62% was approved in April, 2011). After FDA approval, Testosterone was widely advertised and marketed by Defendants as safe and effective Testosterone Replacement Therapies.

43.     AndroGel is a Testosterone hydroalcoholic gel, which is applied to the shoulders and upper arms. Androderm is a Testosterone patch, which is applied to the back, abdomen, arms and thighs. These drugs enter the body through transdermal absorption.

44.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

45.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

46.     In men, testosterone levels normally begin a gradual decline after the age of thirty.

47.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood.  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication.  Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

48.     AndroGel and Androderm may produce undesirable side effects to patients who use the drugs, including but not limited to, myocardial infarction, stroke, and death.

49.     In some patient populations, AndroGel and Androderm use may increase the incidence of myocardial infarctions and death by over 500%.

50.     In addition to the above, AndroGel and Androderm have been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied Testosterone. Patients taking Testosterone may experience enlarged prostates and increased serum prostate-specific antigen levels.

51.     Secondary exposure to Testosterone can cause side effects in others. In 2009 the FDA issued a black box warning for Testosterone prescriptions, advising patients of reported virilization in children who were secondarily exposed to Testosterone gel. Testosterone may also

cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with Testosterone.

52.     Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

53.     Defendants successfully marketed Testosterone by undertaking a "disease awareness" marketing campaigns. These campaigns sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low T."

54.     Defendants' advertising programs sought to create the image and belief by consumers and their physicians that the use of Testosterone was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

55.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Testosterone. Defendants deceived potential Testosterone users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

56.     Defendants concealed material relevant information from potential Testosterone users and minimized user and prescriber concern regarding the safety of Testosterone.

57.     In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants fail to mention any potential cardiac or stroke side effects and falsely represents that Defendants adequately tested Testosterone for all likely side effects.

58.     As a result of Defendants' advertising and marketing, and representations about their products, men in the United States pervasively seek out prescriptions for Testosterone.  If Plaintiff in this action had known the risks and dangers associated with Testosterone, Plaintiff would not have taken Testosterone and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

59.     Plaintiff was prescribed Androderm and used it as directed from February 2010 to January 2012. Plaintiff was prescribed AndroGel 1% and used it as directed from January 2012 to January 2013. Plaintiff was also prescribed AndroGel 1.62% and used it as directed from approximately January 2013 to February 2013.

60.     Plaintiff was 57 years of age when he was prescribed and used Testosterone for symptoms he attributed to low testosterone after viewing Defendants' advertisements.

61.     Plaintiff was very healthy and had no history of heart disease prior to taking Testosterone.  In keeping with his healthy and proactive lifestyle, Plaintiff agreed to initiate Testosterone treatment. He relied on claims made by Defendants that Testosterone had been clinically shown to safely and effectively raise testosterone levels.

62.     Plaintiff was diagnosed with myocardial infarction on or about February 20, 2013. As a result, for the rest of his life he must undergo regular testing, adhere to a restrictive diet, and take medication.  Due to his myocardial infarction he is now at markedly increased risk of

additional cardiovascular disease, cerebrovascular accidents, deep vein thrombi, pulmonary emboli and death.

63. Had Defendants properly disclosed the risks associated with Testosterone, Plaintiff would have avoided the risk of myocardial infarction by either not using Testosterone at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

64. As alleged herein, as a direct, proximate, and legal result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug Testosterone, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to myocardial infarction. Plaintiff has endured pain and suffering, has suffered economic loss, including incurring significant expenses for medical care and treatment and will continue to incur such expenses in the future. Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

65. Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

66. The Testosterone manufactured and/or supplied by Defendants were defective due to inadequate warnings or instructions because Defendants knew or should have known that the products created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks. The Testosterone manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of Testosterone, Defendants failed to provide an adequate

warning to consumers and/or their health care providers of the product, knowing the products could cause serious injury.

67.     As a direct and proximate result of Plaintiff's reasonably anticipated use of Testosterone as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

68.     Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though set forth herein.

69.     At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Testosterone.

70.     At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold Testosterone and failed to adequately test and warn of the risks and dangers of Testosterone.

71.     Despite the fact that Defendants knew or should have known that Testosterone caused unreasonable, dangerous side effects, Defendants continued to market Testosterone to consumers including Plaintiff, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions Testosterone's advertising claims are caused by low testosterone.

72.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

73.     Defendants' negligence was a proximate cause of Plaintiff's injuries, harm and economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

**THIRD CAUSE OF ACTION
FOR BREACH OF IMPLIED WARRANTY**

74.     Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

75.     Prior to the time that the aforementioned products were used by Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that Testosterone was of merchantable quality and safe and fit for the use for which it was intended.

76.     Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using Testosterone.

77.     Testosterone was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that Testosterone has dangerous propensities when used as intended and will cause severe injuries to users.

78.     As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

**FOURTH CAUSE OF ACTION
FOR BREACH OF EXPRESS WARRANTY**

15

79.     Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth here.

80.     At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Testosterone is safe, effective, fit and proper for its intended use. Plaintiff purchased Testosterone relying upon these warranties.

81.     In utilizing Testosterone, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that Testosterone is unsafe and unfit for its intended uses.

82.     As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## FIFTH CAUSE OF ACTION
## FRAUD

83.     Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though set forth fully herein.

84.     Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Testosterone, and up to the present, willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning Testosterone, which the Defendants had a duty to disclose.

85.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Testosterone and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using

Testosterone. Defendants knew of the foregoing, that Testosterone is not safe, fit and effective for human consumption, that using Testosterone is hazardous to health, and that Testosterone has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

86.     Defendants concealed and suppressed the true facts concerning Testosterone with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff physicians would not prescribe Testosterone, and Plaintiff would not have used Testosterone, if they were aware of the true facts concerning its dangers.

87.     As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

88.     Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

89.     From the time Testosterone was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that Testosterone was safe, fit and effective for human consumption. At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Testosterone and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned products.

90.     The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales

representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

91.     The representations by the Defendants were in fact false, in that Testosterone is not safe, fit and effective for human consumption, using Testosterone is hazardous to health, and Testosterone has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

92.     The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of Testosterone.

93.     In reliance of the misrepresentations by the Defendants, and each of them, Plaintiff was induced to purchase and use Testosterone. If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used Testosterone. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

94.     As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## **PUNITIVE DAMAGES ALLEGATIONS**

95.     Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth herein.

96.     The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other Testosterone users and for the primary purpose of

increasing Defendants' profits from the sale and distribution of Testosterone. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

97.     Prior to the manufacturing, sale, and distribution of Testosterone, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Testosterone.

98.     Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Testosterone and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Testosterone. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Testosterone knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

99.     Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

(a)     For general damages in a sum in excess of the jurisdictional minimum of this Court;

(b)     For medical, incidental, and hospital expenses according to proof;

(c)     For pre-judgment and post-judgment interest as provided by law;

(d)     For full refund of all purchase costs Plaintiff paid for Testosterone;

(e)     For compensatory damages in excess of the jurisdictional minimum of this Court;

(f)     For consequential damages in excess of the jurisdictional minimum of this Court;

(g)     For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(h)     For attorneys' fees, expenses, and costs of this action; and

(i)     For such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts and as to all issues.

Dated: April 23, 2014                    Respectfully submitted,

*/s/ Trent B. Miracle*
Trent B. Miracle (IL 6281491)
Brendan A. Smith (MO 65190)
**SIMMONS BROWDER GIANARIS**
**ANGELIDES & BARNERD LLC**
One Court Street
Alton, IL 62002
Telephone: (618) 259-2222
Facsimile: (618) 259-2251

20

tmiracle@simmonsfirm.com
bsmith@simmonsfirm.com
and

David S. Ratner (NY 7758)
David T. Sirotkin (NY 4863)
**MORELLI ALTERS RATNER LLP**
950 Third Avenue, 11th Floor
New York, NY 10022
Telephone: 212.751.9800
Facsimile: 212.751.0046

**Attorneys for Plaintiff**